J. BENNETT FRIEDMAN, ESQ., State Bar No. 147056
    *jfriedman@jbflawfirm.com*
STEPHEN F. BIEGENZAHN, ESQ., State Bar No. 60584
    *sbiegenzahn@jbflawfirm.com*
MICHAEL D. SOBKOWIAK, ESQ., State Bar No. 242718
    *msobkowiak@jbflawfirm.com*

FRIEDMAN LAW GROUP, P.C.
1900 Avenue of the Stars, 11th Floor
Los Angeles, California 90067
Telephone: (310) 552-8210
Facsimile: (310) 733-5442

[Proposed] Attorneys for Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>**HDOS ENTERPRISES**, a California corporation,<br><br>          Debtor and Debtor in Possession. | Case No. 2:14-bk-12028-NB<br><br>Chapter 11<br><br>**DEBTOR'S EMERGENCY FIRST DAY MOTION FOR AN ORDER AUTHORIZING DEBTOR TO PAY PRE-PETITION CLAIMS OF CERTAIN CRITICAL VENDORS NECESSARY FOR ITS CONTINUED OPERATIONS**<br><br>Date:  [Hearing To Be Set]<br>Time:<br>Place: Ctrm 1545<br>          255 E. Temple Street<br>          Los Angeles, CA 90012 |

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### I.

### INTRODUCTION

HDOS Enterprises, debtor and debtor in possession in the above-captioned chapter 11 case (Debtor" and "Case," respectively) hereby moves this Court, on an emergency basis, for entry of an order: (i) authorizing the Debtor to pay its main supplier, Shamrock Foods Company ("Shamrock"), for 20 days' worth of its pre-petition claim, which the Debtor estimates to be approximately $200,000[1]; and (ii) authorizing the Debtor to pay all credit card processing fees and chargebacks owed pre-petition to its credit card processors. The Debtor estimates the pre-petition processing fees to be $31,200 and expects the chargebacks to be de minimus, especially in comparison to the value to the chapter 11 estate ("Estate") of continuing to accept payment by credit card in an uninterrupted fashion.[2]

Shamrock is the Debtor's primary supplier of goods used in its restaurants. The Debtor estimates that Shamrock supplies approximately 80% of all food items used by the Debtor in its restaurants. Maintenance of the supply relationship with Shamrock is absolutely critical to the Debtor's survival as a going concern. Further, the Debtor only seeks authority to pay the amount that is entitled to administrative priority under Section 503(b)(9).

Equally critical is the Debtor's relationship with its credit card processors, which allows the Debtor to accept credit cards as payment at the Debtor's restaurants. The Debtor estimates that approximately 42% of all sales are made via credit card. If the Debtor were unable to accept credit cards as payment for its goods and services, the Debtor would not be able to survive as a going concern.

---

[1] To ensure the maintenance of adequate cash reserves, Debtor requests approval to pay Shamrock ten (10) equal weekly installments of $20,000. Shamrock has indicated to Debtor that it is agreeable to these payment terms.

[2] Factual statements made here are supported by the concurrently filed Declaration of Dan Smith in Support of Debtor's Emergency First Day Motions ("Smith Declaration").

1

This Motion is based on the facts and law stated herein, the concurrently filed Smith Declaration, the contemporaneous Notice of Hearing on Emergency First Day Motions, all arguments and evidence that may be submitted at the hearing on the Motion, and such other papers and evidence of record as the Court may consider.

The statutory predicate for the relief requested in this Motion is Bankruptcy Code sections 105(a), 363(b)(1), 363(c), and 503(b)(9), Federal Rules of Bankruptcy Procedure 6003(b) and 6004(h), and Local Bankruptcy Rule 9014-5.

## II.

## FACTUAL BACKGROUND

The Debtor is an employee-owned business that operates approximately 92 Hot Dog on a Stick restaurants. The Debtor's business has suffered significantly since the Great Recession began in 2007. Most of the Debtor's challenges can be attributed to approximately 21 very unprofitable locations with expensive leases. The Debtor has filed these bankruptcy proceedings primarily to negotiate with its landlords seeking modification of the leases and, if necessary, close these unprofitable locations, which had expenses that exceeded revenue by approximately $950,000 in 2013. Once the Debtor closes these unprofitable locations and rejects the leases, the Debtor anticipates confirming a plan that pays all creditors in full over a five or six year period, with interest. More details on the Debtor's business may be found in the Smith Declaration.

Shamrock is the Debtor's primary supplier of food and other goods needed to operate its restaurants. Shamrock and the Debtor are parties to a Foodservice Distribution Agreement dated May 1, 2013 (the "Supply Agreement"). Pursuant to the Supply Agreement, Shamrock provides approximately 80% of all such goods purchased by the Debtor to operate its restaurants, including dry groceries, meat, poultry, beverages, and other items. A copy of the Supply Agreement is attached to the Smith Decl. as Exhibit "A". The Debtor typically pays Shamrock approximately every on the 20th day of the month, for the preceding month's products. As of the February 3, 2014 petition date (the "Petition Date"), the Debtor owed Shamrock approximately $764,000, which represents roughly fifty-eight (58) days worth of goods supplied by Shamrock to the Debtor

pre-petition. Of that amount, approximately $200,000 is related to the goods provided by Shamrock to the Debtor in the 20 day period prior to the bankruptcy filing. Smith Declaration at ¶ 62. The Supply Agreement provides, among other things, that it may be terminated by Sharmrock if any payments are not made under the Agreement, and if there is a material adverse change in the Debtor's financial condition. (Supply Agreement, §§ 18.2.2, 18.2.5).

The Debtor also has agreements with certain credit card processors that enable the Debtor to accept credit cards as payment for its goods and services. Those credit card processors are Global Payments Direct, Inc. ("Global"), WorldPay and American Express (collectively the "CC Processors"). A copy of the Global processing agreement is attached as Exhibit "B" to the Smith Decl. (The Debtor is still searching for its agreements with WorldPay and American Express.) The CC Processors are essential to the Debtor's operations because modern customers take the flexibility to pay by credit card for granted. The Debtor estimates that approximately 42% of its sales by volume are paid by credit card. Losing the ability to process credit card payments would likely result in a significant loss in sales for the Debtor, endangering the Debtor's ability to continue in operation. As of the Petition Date, the Debtor estimates it will owe the CC Processors approximately $33,850 (approximately $31,500 to Global, approximately $1,000 to WorldPay and approximately $1,350 to American Express).

The Debtor's agreements with the CC Processors allows the CC Processors to deduct their fees from the Debtor's operating account at TPB once a month for the total amount due as a result of the prior month's deposits. For instance, the CC Processors deducted their fees for the transactions processed in December on January 3, 2014. Under the normal course of the Debtor's agreements with the CC Processors, the CC Processors would deduct fees for the transactions processed in the month of January 2014 on February 3, 2014. To ensure that it is able to continue accepting credit cards and the CC Processors do not terminate their agreements with the Debtor, the Debtor needs to ensure the CC Processors can deduct their fees for the January transactions post-petition.

-3-

Furthermore, the agreements with the CC Processors permit the CC Processors to charge to the Debtor's account the amount of any "chargebacks," or credit card transactions that are not honored by the issuing institution for any reason, such as when a consumer disputes the charge. (*See, e.g.*, Global Agreement, § 14). These chargebacks are accomplished daily in the Debtor's credit account maintained with the CC Processor. As part of this Motion, the Debtor seeks authority to permit chargebacks to be deducted from its credit in the normal course of business, even if the chargeback is on account of a pre-petition transaction. The Debtor believes that the amount of pre-petition chargebacks is *de minimus*, especially when compared with the value to its estate of continuing to accept credit card payments in an uninterrupted fashion.

## III.

## NEED FOR EMERGENCY RELIEF

The Debtor seeks the relief requested by the Motion on an emergency basis because it needs to maintain good relations with Shamrock and the CC Processors to stay in operation. The relief in this motion will allay concerns that these critical vendors may have due to the Debtor's bankruptcy filing and allow the Debtor to maintain a "business as usual" relationship with these parties that enables it to stay in operation during the Case.

## IV.

## ARGUMENT

A.  **The Bankruptcy Code and Case Law Authorize Operating Debtors to Pay Pre-Petition Claims of Critical Vendors.**

There are four primary and separate bases for approving payments to critical vendors to enable the survival of an operating chapter 11 debtor.

First, Federal Rule of Bankruptcy Procedure 6003(b) contemplates that bankruptcy courts may issue orders authorizing debtors "to pay all or part of a claim that arose before the filing of the petition" if the relief is "necessary to avoid immediate and irreparable harm." Courts have thus interpreted this rule as authorizing payments of pre-petition claims to critical vendors. *In re Humboldt Creamery, LLC*, 2009 Bankr. LEXIS 2477 at *3, n.2 (Bankr. N.D. Cal. Apr. 23, 2009)

-4-

("Nothing in the Bankruptcy Code forbids payment on a prepetition debt before confirmation of a plan, and Rule 6003(b) specifically contemplates such payments.").

Second, to the extent a claim is entitled to administrative priority, such as a claim for the value of goods received by the Debtor within the 20 day prior to the Petition Date which enjoys administrative priority under Bankruptcy Code section 503(b)(9), bankruptcy courts have the discretion to allow those payments to be made prior to plan confirmation. *See, In re Garden Ridge Corp.*, 323 B.R. 136, 143 (Bankr. D. Del. 2005) ("Courts have discretion to determine when an administrative expense will be paid.").

Third, Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts have interpreted that statute to authorize the payment of prepetition claims to critical vendors. *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (court authorized debtor to pay pre-petition wages 363(b) when debtor "articulat[ed] sound business reasons" for doing so, showing that it was "critical for it to pay such pre-petition claims in order to preserve and protect its business and ultimately reorganize"). In addition to Section 363(b), some courts have also approved critical vendor payments under Section 363(c). *See, In re James A. Phillips, Inc.*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (court relied on section 363(c)(1) to authorize debtor-contractor to pay prepetition claims of suppliers who had potential lien claims in the ordinary course, since the filing of the liens claims threatened to stop work on the debtor's projects).

Fourth, Bankruptcy Code section 105(a) codifies the inherent equitable powers of the bankruptcy court, and empowers the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Courts interpreting Section 105(a) have developed a "necessity of payment" rule which holds that bankruptcy courts have the ability to authorize the debtor's payment of prepetition obligations when necessary to the continued operation of the debtor's business. This rule was first announced by the United States Supreme Court in *Miltenberger v. Logansports, C. & S. W. R. Co.*, 106 U.S.

286, 310-12 (1882) (holding that consistent with a receiver's duty to "protect and preserve the trust funds" in the receivership estate, "[m]any circumstances may exist which may make it necessary and indispensable to the business ... and the preservation of the property, for the receiver to pay pre-existing debts ... out of the earnings of the [debtor] ... under the order of the court."). The doctrine was first applied in railroad reorganizations but later expanded to all manner of business reorganizations. *See, Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (Learned Hand, J.) (first expanding the doctrine beyond railroads to a hotel reorganization, the court stated "Let it [a hotel] once be shut down, and it will lose much of its value ... Some priority [to the hotel's prepetition suppliers] may be essential to the presentation of the business"). *See also, In re Ionosphere Clubs, Inc.*, 98 B.R. at 176 (discussing the necessity of payment rule under section 105(a) as a separate basis from section 363(b) for approval of a payment of a prepetition creditor's claim). The necessity of payment rule is the strongest in the Third Circuit, but continues to be applied in other jurisdictions as well. *In re Lehigh & New England Railway Co.*, 657 F.2d 570, 581 (3d Cir. 1981) ("[T]he 'necessity of payment' doctrine ... [permits] immediate payment of claims of creditors where those creditors will not supply services or materials essential to the conduct of the business until their pre-reorganization claims shall have been paid.") (*quoting In re Penn Central Transp. Co.*, 467 F.2d 100, 102, n.1 (3d Cir. 1972); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-26 (D. Del. 1999) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) (following doctrine); *In re Chateaugay Corp.*, 80 B.R. 279, 287 (S.D.N.Y. 1987) (following doctrine). Other circuits, such as the Seventh Circuit, have indicated disapproval of the necessity of payment doctrine. *See, e.g., In re Kmart Corp.*, 359 F.3d 866, 874 (7th Cir. 2004).

In the Ninth Circuit, courts have approved critical vendor payments under Rule 6003(b) and under the theory that an administrative claim may be paid early. *See, In re Humboldt Creamery, LLC*, 2009 Bankr. LEXIS 2477 at *3-4 (Bankr. N.D. Cal. Apr. 23, 2009) (authorizing debtor, which operated a creamery, to pay pre-petition claims of milkmen that would be entitled to

-6-

priority under Bankruptcy Code section 503(b)(9)). The *Humboldt Creamery* court reasoned that: "[n]othing in the Bankruptcy Code forbids payment on a prepetition debt before confirmation of a plan, and Rule 6003(b) specifically contemplates such payments. The court concludes that prepetition debt, and especially a priority debt, may be paid before confirmation if in the best interests of the estate." *Id.* *3, n.2. There have not been cases in the Ninth Circuit expressly deciding whether 363(b) is a sufficient, stand-alone justification for payment of the pre-petition claim of a critical vendor. As to the necessity of payment rule, there have been Ninth Circuit cases both approving and disapproving the doctrine. Compare *In re Adams Apple, Inc.*, 829 F.2d 1484, 1490 (9th Cir. 1987) (Noting with approval that "[c]ases have permitted unequal treatment of pre-petition debts when necessary for rehabilitation, in such contexts as . . . debts to providers of unique and irreplaceable supplies . . .") with *In re B&W Enterprises, Inc.*, 713 F.2d 534, 537 (9th Cir. 1983) ("The Necessity of Payment Rule was created for and has been applied only to railroad cases. Absent compelling reasons, we deem it unwise to tamper with the statutory priority scheme devised by Congress in the 1978 Act.").

**B.    This Court Should Authorize the Debtor to Pay the 20 Day 503(b)(9) Claim of Shamrock Immediately Under the Necessity of Payment Rule.**

Whether under Rule 6003(b), Section 503(b)(9), Section 363(b), or the necessity of payment rule (to the extent it applies), the Debtor should be allowed to pay the portion of Shamrock's claim relating to the goods provided in the 20 day period prior to the Petition Date. First of all, all unsecured claims are expected to be paid in full in this case, with interest. Second, the portion of Shamrock's claim relating to the goods provided in the 20 day period prior to the Petition Date are clearly entitled to administrative priority under Bankruptcy Code section 503(b)(9). This is because the terms on which they were supplied were the normal terms on which Shamrock supplies goods to the debtor, and so was in the ordinary course of business. Further, the food items supplied by Shamrock are plainly goods under California Commercial Code section 9102(a)(44). Third, and perhaps most importantly, Shamrock supplies 80% of the goods purchased by the Debtor for the operation of its business. Shamrock could use the

-7-

significant claim owing as of the Petition Date to either stop providing goods to the Debtor or to provide them on terms more favorable to Shamrock going forward. It is essential that the Debtor maintain its supply arrangement with Shamrock in its current form. Not only does the Debtor need to continue receiving goods from Shamrock to operate, but it also needs to continue receiving them on the same or substantially similar terms so that the financial assumptions underlying its reorganization effort remain valid. Fourth, since the payment owed to Shamrock relates to goods provided in the last 20 day period, all of them are subject to a potential reclamation claim under Section 546(c), which provides generally that a seller of goods may reclaim goods sold in the ordinary course of the debtor's business in the 45 day period prior to filing if the debtor received them while insolvent.[3] Fifth, these concerns are well founded as the Supply Agreement with Shamrock provides that Shamrock may terminate upon any missed payment and upon a material adverse change in the Debtor's financial condition (Supply Agreement, §§ 18.2.2, 18.2.5), so continued relations with Shamrock will require an extension of goodwill by Shamrock beyond the four corners of the parties' contract.

It is clear from the above that under Rule 6003(b) and Section 503(b)(9), the ability to pay at least this portion of claim is needed "to avoid immediate and irreparable harm." A refusal to supply goods or an alteration of the terms on which goods are supplied could kill the Debtor's reorganization efforts. Further, the above constitute "sound business reasons" for paying the 20 day portion of the claim under Section 363(b)(1). Finally, for similar reasons, to the extent the necessity of payment rule applies in the Ninth Circuit, it would be satisfied because the goods that Shamrock provide are "essential to the conduct of the business" of the Debtor. Additionally, payments of $20,000 per week will help assure the stability of the Debtor's cash flow, particularly during the outset of this Case.

///

///

---

[3] The Debtor does not believe that such a reclamation claim would be successful, but avoiding litigation over it would be a material benefit to the Debtor's estate.

**C.    This Court Should Authorize the Debtor to Pay the Credit Card Processors their Pre-Petition Processing Fees and Chargebacks.**

The ability of the Debtor to accept credit cards as payment, like the goods provided by Shamrock, is absolutely critical to the Debtor's continued operation. For that reason, the Debtor seeks permission to pay any credit card processing fees and chargebacks owing under its agreements with the CC Processors in the ordinary course of business. The Debtor simply cannot afford any disruption in its ability to accept credit cards, and a material change in terms required by the CC Processors could imperil this reorganization. The need to maintain the status quo with the CC Processors by paying pre-petition processing fees and honoring any pre-petition chargebacks is thus authorized under Rule 6003(b), since doing so would avoid irreparable harm that would result to the Debtor's business if it lost the ability to accept credit cards, or was forced to accept materially different terms for such processing. For the same reasons, the Debtor also has sound business reasons to make any pre-petition payment of processing fees and chargebacks under Section 363(b), and/or to continuing making such payments in the ordinary course under Section 363(c). Finally, to the extent it applies, the necessity of payment doctrine would support paying the pre-petition processing fees and chargebacks since the ability to accept payment by credit card is "essential" to the Debtor's business operations.

[THIS SPACE INTENTIONALLY BLANK]

V.

## CONCLUSION

For the reasons set forth above, this Motion should be granted, and the Court should enter an order: (i) authorizing the Debtor to pay Shamrock for 20 days' worth of its pre-petition claim, which the Debtor estimates to be approximately $200,000, paid in 10 weekly installments of $20,000 each; and (ii) authorizing the Debtor to pay all pre-petition credit card processing fees and chargebacks owed to the CC Processors.

Date: February 3, 2014

FRIEDMAN LAW GROUP, P.C.

By: _____
J. Bennett Friedman
Stephen F. Biegenzahn
Michael D. Sobkowiak
Proposed Attorneys for Debtor in Possession
HDOS Enterprises