1  **J. BENNETT FRIEDMAN, ESQ., State Bar No. 147056**
    *jfriedman@jbflawfirm.com*
2  **STEPHEN F. BIEGENZAHN, ESQ., State Bar No. 60584**
    *sbiegenzahn@jbflawfirm.com*
3  **MICHAEL D. SOBKOWIAK, ESQ., State Bar No. 242718**
    *msobkowiak@jbflawfirm.com*
4

5  **FRIEDMAN LAW GROUP, P.C.**
   1900 Avenue of the Stars, 11th Floor
6  Los Angeles, California 90067
   Telephone: (310) 552-8210
7  Facsimile: (310) 733-5442

8

9  [Proposed] Attorneys for Debtor and
   Debtor in Possession
10

11                **UNITED STATES BANKRUPTCY COURT**

12                **CENTRAL DISTRICT OF CALIFORNIA**

13                     **LOS ANGELES DIVISION**

14  In re                                Case No. 2:14-bk-12028-NB

15  **HDOS ENTERPRISES**, a California     Chapter 11
    corporation,
16                                        **NOTICE OF MOTION AND MOTION
                Debtor and Debtor in      FOR 60 DAY INTERIM ORDER
17              Possession.               AUTHORIZING USE OF CASH
                                          COLLATERAL**
18
                                          Date:    [Hearing To Be Set]
19                                        Time:
                                          Place:   Ctrm 1545
20                                                 255 E. Temple Street
                                                   Los Angeles, CA 90012
21

22

23

24

25

26

27

28

- 1 -

**TO THE HONORABLE NEIL W. BASON, UNITED STATES BANKRUPTCY JUDGE; THE UNITED STATES TRUSTEE; TORREY PINES BANK, AND ITS COUNSEL; OTHER CREDITORS WITH AN INTEREST IN CASH COLLATERAL; AND DEBTOR'S TWENTY LARGEST UNSECURED CREDITORS:**

**PLEASE TAKE NOTICE** that HDOS Enterprises, the above-captioned debtor ("Debtor") will and does move the court (the "Motion") for an order authorizing the Debtor to use cash collateral on an interim basis.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the declaration of Dan Smith (the "Smith Declaration"), the records and files of this chapter 11 case ("Case") and such other arguments and evidence as may be presented at or before any hearing on the Motion.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will be held _____, 2014 commencing at __:00 a.m. or as soon thereafter as counsel can be hearing in Courtroom 1545 of the Roybal Federal Building located at 255 E. Temple Street, Los Angeles, California, 90012 ("Hearing").

**PLEASE TAKE FURTHER NOTICE** that the Hearing will be a "preliminary hearing" as that phrase is used in 11 U.S.C. § 363(c)(3); the Motion will seek authority, on an interim basis, to use the cash collateral of its various secured creditors.

**PLEASE TAKE FURTHER NOTICE** that if you wish to object to the Motion ("Objection"), you must do so in a writing which comports with Local Bankruptcy Rule 9013-1, including the requirement that you file and serve your Objection in advance of the Hearing.

**PLEASE TAKE FURTHER NOTICE** that if you fail to timely file and serve your Objection (including service on the Court), the Motion may be granted without consideration of any argument you might otherwise have made.

///

///

///

///

- 2 -

1    **PLEASE TAKE FINAL NOTICE** that the Hearing may be continued from time to time

2    without further notice; therefore, if you wish to attend the Hearing, it is incumbent upon you to

3    keep track of the scheduling or re-scheduling of the Hearing.

4    Dated: February 3, 2014             FRIEDMAN LAW GROUP, P.C.

5

6

7                                       By _____

8                                          J. BENNETT FRIEDMAN, ESQ.
                                           STEPHEN F. BIEGENZAHN, ESQ.
9                                          MICHAEL D. SOBKOWIAK, ESQ.
                                           Proposed Attorneys for Debtor and Debtor-in-
10                                         Possession HDOS Enterprises

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION AND RELIEF REQUESTED

Debtor commenced the Case on February 3, 2014 ("Petition Date"). By this Motion,[1] the Debtor requests that the Court enter a 60 day interim order authorizing it to utilize cash collateral to defray necessary operating expenses, such as the purchase of inventory, pay rent to its landlords, and the payment of wages and utilities, and to defray reasonable and necessary costs and expenses incurred in, and in connection with the Case, subject to the terms and conditions set forth in the order. The nature and approximate amounts of the contemplated expenses are set forth in Exhibit "1" to the Smith Declaration ("Budget").

Torrey Pines Bank (the "Bank"), which holds a first priority position with respect to Debtor's assets (including but not limited to cash collateral[2]), is owed the approximate principal sum of $1.24 million. Monthly payments to the Bank are currently reflected in the Budget at $23,034 until April 17, 2014 when the monthly payment increases per the terms of the loan with the Bank to $45,522; however, the Debtor does not contemplate making an "adequate protection" payment for the month of February. As of the Petition Date, the Debtor is current on its payments to the Bank. There are two other creditors who hold security interests in certain of Debtor's assets; whose rights are, as a result of written subordination agreements, subject to the priority of the Bank with respect to cash collateral. As indicated in the Smith Declaration, Debtor believes these subordinated creditors will consent to the use of cash collateral as requested in the Motion.

### II.

### JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter relates to the administration of the Debtor's bankruptcy estate ("Estate") and is

---

[1] Definitions provided in the preceding Notice are incorporated here.

[2] As phrase is defined in 11 U.S.C. § 363(a).

1  accordingly a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O).  Venue of the

2  case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates

3  for the relief requested in the Motion are sections 105, 361, 363 and 503 of title 11 of the United

4  States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure

5  (the "FRBP") and Rules 4001-2 and 9013 of the Local Bankruptcy Rules ("LBR").

6                                              **III.**

7                                    **BACKGROUND FACTS**

8       **A.       The Debtor's Business and the Chapter 11 Case.**

9            As indicated above, the Case was commenced on the Petition Date with the filing of a

10  voluntary bankruptcy petition for relief under chapter 11 of the Bankruptcy Code.[3]

11           The Debtor is an employee-owned business that operates approximately 92 Hot Dog on a

12  Stick restaurants (the "Restaurant[s]").  The Debtor's business has suffered significantly since the

13  "Great Recession" began in 2007.  Most of the Debtor's challenges can be attributed to

14  approximately 21 very unprofitable locations burdened by expensive above market-rate leases.

15  The Debtor commenced the Case primarily to explore options with its landlords and, if necessary,

16  close these unprofitable locations, which had expenses that exceeded revenue by approximately

17  $950,000 in 2013.  *See* Smith Declaration at ¶ 3.  In the event the Debtor closes these

18  unprofitable locations and rejects the underlying leases, the Debtor anticipates confirming a plan

19  that will pay all creditors over a five or six year period.  More details on the Debtor's business

20  may be found in the concurrently filed Declaration of Dan Smith in Support of Debtor's

21  Emergency First Day Motions.

22           The Debtor disclosed in its initial filing that it has three creditors which hold security

23  interests in assets of the Estate, including cash collateral.  As indicated above, and illuminated in

24  the Smith Declaration, the Bank obtained contractual subordination rights vis-à-vis two creditors

25  whose rights were prior in time.[4]  *Id.* at ¶ 7.

26

27      [3] Title 11, United States Code, § 101, *et seq*, sometimes referred to here as the
"Bankruptcy Code" or simply the "Code."

28      [4] The statements made here and in the Smith Declaration regarding the relative priority of

The Bank has been a lending source for Debtor since 2007, when the Bank made an initial loan of $6.5 million to Debtor. This obligation was satisfied in full in 2012. Debtor is presently obligated to the Bank for approximately $1.24 million as follows: (i) In March 2013 Debtor entered into a 36 month term note with Bank for $600,000 (the "Term Note"). Monthly payments on the term note are $18,556.74, and the current balance is $445,015. (ii) On September 17, 2013 Debtor received a $1,000,000 line of credit from the Bank (the "Line"), and drew down $800,000 on the Line. The terms of the Line provide for interest only payments through March 17, 2014, and the monthly present payment is $4,759. Smith Declaration at ¶ 9. Beginning April 17, 2014, Debtor is scheduled to make 42 principal and interest payments of $26,966. As of the Petition Date, Debtor was current with all payments on the Term Note and the Line. Both obligations are secured by Debtor's inventory, chattel paper, accounts receivable, equipment, deposit accounts, and general intangibles (including trademarks, trade secrets and copyrights) (collectively, the "Collateral"), as well as proceeds from the Collateral. *Id.* at ¶¶ 9 – 10.

At the time the Case was commenced, Debtor's cash on hand was approximately $1,486,000 (subject to checks in float which were not material.) *Id.* at para. ¶ 11. Debtor generates approximately $470,000 in cash each month it operates; and it projects that its gross revenue will increase over the next several months, provided the Motion is granted, and it is allowed to operate in chapter 11. *Id.* at ¶ 12.

As stated previously, the primary goal of Debtor is to close its unprofitable locations. The significant majority of Debtor's Restaurants are profitable. For instance, Debtor generated a $3.9 million profit from its 30 top performing stores in 2013. Debtor expects that the sale of these 30 locations would likely result in a price of 4x to 5x EBITDA. Accordingly, stripped of all liabilities, Debtor would likely receive at least $15.6 million in a negotiated sale of its top 30 stores. Even at a reduced multiple of 2x EBITDA, Debtor would expect to receive $8 million for

the various secured claims reflects the best knowledge, information and belief of Debtor and its counsel. Debtor does not seek any binding determination regarding the relative priority of the three subordinate creditors.

1    these locations. Ignoring for a moment Debtor's assets other than these 30 locations, the Bank is

2    greatly over-secured on its $1.24 million obligation. Smith Declaration at ¶¶ 14 – 15.

3         Further, within the next seven days, the Debtor will be employing a real estate

4    professional experienced with the shopping center landlords that lease to the Debtor. Such

5    professional will be instrumental in assisting in the negotiations for modifications of the leases

6    for the benefit of the Estate.

7         Additionally, it is likely that Debtor's most valuable asset is its intellectual property,

8    including the name Hot Dog on a Stick. This brand name is iconic and widely recognized by the

9    general public, and Debtor has worked tirelessly to build the brand value it now enjoys. The

10   value of Debtor's ownership and control of the name Hot Dog on a Stick is likely between $1.5

11   and $3.0 million, and exceeds, by a material measure, the relatively modest amount Debtor owes

12   to the Bank. *Id.* at ¶ 16.

13   **B.    The Debtor's Need to Use Cash Collateral.**

14        The Debtor seeks authority to use assets that may constitute cash collateral to pay its

15   ordinary, ongoing operating expenses going forward in general conformity with the Budget.

16   Debtor believes the Budget is fair and reasonable under the circumstances. Although operating

17   expenses in the initial stages of any bankruptcy case are difficult to calculated, it is Debtor's belief

18   that line items in the Budget should not vary by more than fifteen to twenty percent. Smith

19   Declaration at ¶ 12.

20        The Bankruptcy Code defines "cash collateral" as "cash, negotiable instruments,

21   documents of title, securities, deposit accounts or other cash equivalents in which the estate and an

22   entity other than the estate have an interest . . . ." 11 U.S.C. §363(a). Section 363(c)(2)

23   establishes a special requirement with respect to "cash collateral," providing that the trustee or

24   debtor in possession may use cash collateral under subsection (c)(I) if

25        (A) each entity that has an interest in such cash collateral consents;

26        or

27        (B) the court, after notice and a hearing, authorizes such use, sale

28        or lease in accordance with the provisions of this section.

11 U.S.C. §363(c)(2)(A) and (B).  Further, upon the request of an entity that has an interest in property proposed to be used by the Debtor, the Court shall prohibit or condition such use "as is necessary to provide adequate protection of such interest." 11 U.S.C. §363(e).

It is well settled that a chapter 11 debtor should be allowed to use cash collateral for the purpose of maintaining and operating its business. 11 U.S.C. § 363(c)(2)(B); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614 (9th Cir. BAP 1991).  In addition, where the Debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business." *In re Dynaco Corp.*, 162 B.R. 389 (Bankr. D.N.H. 1993), quoting *In re Stein*, 19 B.R. 458, 459 (Bankr. 14 E.D. Pa. 1982).

Debtor's Case is fairly straightforward – the profitability of Debtor is impaired by a number of leases entered into between 2004 and 2007 which are well above present market rate. The Debtor has determined that it would clearly be in the overwhelming best interests of the Estate and its creditors to continue to operate and maintain its business as a going concern.  Through the continued operation of its profitable locations, there is a substantial likelihood Debtor will be able to propose a reorganization plan which will pay all claims a substantial dividend, if not in full.  In contrast, if the Motion were to be denied, it is likely a free fall would occur, and creditors, other than the Bank, would receive little if anything at all.  The Court should authorize the Debtor to use cash collateral to continue to operate and maintain its business because it ensures that the interests of not only the Bank, but also those of the subordinated secured creditors, are adequately protected; and it is the only means by which the Debtor can move forward toward a reorganization effort that it believes will be successful.

As indicated above, without the use of Cash Collateral, the Debtor will be forced to shutter each of its 92 locations and close its business; thus eliminating approximately 750 jobs and irreparably tarnishing all goodwill associated with its name; leaving every creditor other than the Bank with nothing.  *See* Smith Declaration at ¶ 18.

Accordingly, the Court should authorize the Debtor to use Cash Collateral on an interim

5

1  basis and upon the terms proposed herein, because the secured creditors' interests, as described

2  herein, will be adequately protected, and such use is in the best interest of this estate and its

3  creditors.

4        C.    **The Bank Will Be Adequately Protected**.

5        To the extent that an entity has a valid security interest in the revenues generated by an

6  operating business, those revenues constitute "cash collateral" under Section 363(a) of the

7  Bankruptcy Code.  Pursuant to Section 363(c)(2), the Court may authorize the debtor to use a

8  secured creditor's cash collateral if that creditor is adequately protected.  *In re Mellor*, 734 F.2d

9  1396, 1400 (9th Cir. 1984); *see also In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re*

10  *McCombs Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. 1988).

11        1.    **The Value of the Collateral Is Not Decreasing.**

12        The case law is clear that secured creditors are only entitled to adequate protection to the

13  extent the value of the collateral decreases.  *United Savings Association v. Timbers of Inwood*

14  *Forest Assocs.*, 108 S.Ct. 626, 629-30 (1988).

15        As indicated above, the Budget suggests that, if the Debtor is allowed to operate in chapter

16  11, by the end of March 2014 (the end of the interim 60 day period) Debtor will have available

17  cash of $1,237,960 – which alone fully secures the amount owing to the Bank.  *See* Smith

18  Declaration at Exhibit "1."  There is no evidence that would indicate that the Debtor's business

19  will not generate revenue sufficient to replace the cash used in operations; nor is there any

20  indication that the Debtor's intellectual property – perhaps the most valuable asset in the Estate –

21  will decline in value, provided operations continue.

22        2.    **There is a Substantial Equity Cushion.**

23        It is well established that the existence of an equity cushion alone can constitute adequate

24  protection to a secured creditor when a debtor seeks to use cash collateral.  *In re Mellor*, 734 F .2d

25  1396, 1403 (9th Cir. 1984).  In *Mellor*, the Ninth Circuit held that a 20% equity cushion

26  constituted adequate protection as a matter of law.  *Id.* at 1404.  The Ninth Circuit indicated that a

27  cushion of less than 20% could also constitute adequate protection and cited with approval

28  decisions holding that equity cushions of between 10% and 20% constituted adequate protection.

1     *Id.* (citing *In re McGowan*, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding that a 10% cushion is

2     adequate protection); *In re Rogers Dev. Corp.*, 2 B.R. 679, 685 (Bankr. E. D. Va. 1980) (equity

3     cushion of approximately 15% to 20% was adequate protection); *see also In re Boulders on the*

4     *River, Inc.*, 164 B.R. 99 (9th Cir. BAP 1994) (creditor was adequately protected with an equity

5     cushion of 11.45%); *In re Hawaiian Pacific Indus.*, 17 B.R. 670, 673 (Bankr. D. Hawaii 1982)

6     (15% cushion constituted adequate protection).)

7        Here, although the assets are not susceptible to a 'market value' comparison (as would be

8     the case with pedestrian real property), it is readily apparent the Bank has a substantial equity

9     cushion and will actually benefit from Debtor's continued operations (including maintaining the

10    brand). These continued operations also ensure a liquidation value well in excess of the amount

11    owed to the Bank.

12        Where, as here, the value of the Bank's collateral will be maintained; and the Debtor

13    believes that the subordinate creditors will consent to the use of their cash collateral, the Debtor

14    has satisfied its burden of proof with respect to adequate protection, and the authority to use cash

15    collateral should follow as a matter of law. Further, though Debtor is agreeable to making

16    adequate protection payments, in light of the Bank's greatly over secured position, its entitlement

17    to such payments is reasonably questionable.

18       **D.**     **Debtor's Use of the Cash Collateral is Necessary to Satisfy Expenses Incurred**
             **in its Ordinary Course of Business.**
19

20        In order for Debtor to continue to operate its business, it must pay for routine expenses.

21    These include, without limitation, the purchase of inventory, payment of rent, CAM and other

22    utility charges, and the payment of wages. Absent the ability to pay for its receipt of these

23    business necessities, the Debtor will be forced to terminate its operations – undoubtedly

24    diminishing the possibility of Debtor's successful reorganization, putting nearly 750 employees

25    out of work, and ensuring that Debtor receives minimal value for its assets. Smith Declaration at ¶

26    18.

27

28

## IV.

## CONCLUSION

The Bank is adequately protected by the value of its cash and other collateral.  Debtor's continued operation is imperative as it scrutinizes its core business and sheds unprofitable locations.  Through bankruptcy, Debtor has positioned itself to return to profitability, and can confirm a reorganization plan under which creditors, including the Bank, should receive payment in full with interest.  Without the use of cash collateral to pay operating expenses in the ordinary course of its business, the Bank will have snuffed-out the Case at inception and ensured failure – employees will lose their jobs; and creditors, other than the Bank, will receive little or nothing.

Accordingly, this Court should issue an interim 60 day order authorizing Debtor to pay its ordinary, ongoing operating expenses going forward in general conformity with the Budget.

Dated:  February 3, 2014                    FRIEDMAN LAW GROUP, P.C.

By _____

J. BENNETT FRIEDMAN, ESQ.
STEPHEN F. BIEGENZAHN, ESQ.
MICHAEL D. SOBKOWIAK, ESQ.
Proposed Attorneys for Debtor and Debtor-in-Possession HDOS Enterprises

8